# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRESTON HOLLOW CAPITAL LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) C.A. No. 2019-0169-SG |
| | ) |
| | ) |
| NUVEEN LLC, NUVEEN | ) |
| INVESTMENTS, INC., NUVEEN | ) |
| SECURITIES LLC, and NUVEEN | ) |
| ASSET MANAGEMENT LLC, | ) |
| | ) |
| Defendants. | ) |

## OPINION

Date Submitted: June 7, 2019
Date Decided: August 13, 2019

R. Judson Scaggs, Jr., Barnaby Grzaslewicz, and Elizabeth A. Mullin, of MORRIS NICHOLS ARSHT & TUNNEL, Wilmington, Delaware; OF COUNSEL: David H. Wollmuth, R. Scott Thompson, Michael C. Ledley, Sean P. McGonigle, William A. Maher, Nicole C. Rende, and Jay S. Handlin, of WOLLMUTH MAHER & DEUTSCH LLP, New York, New York, *Attorneys for Plaintiff.*

Peter J. Walsh, Jr., Jennifer C. Wasson, David A. Seal, and Robert J. Kumor, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Eva W. Cole, John E. Schreiber, Molly M. Donovan, Joseph A. Litman, and Mikaela E. Evans-Aziz, of WINSTON & STRAWN LLP, New York, New York, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

*Equity will not enjoin a libel*. This Opinion involves a single issue: the Defendants, business competitors of the Plaintiff, made statements about the Plaintiff to third parties. The Plaintiff believes itself traduced. It seeks solely equitable relief for the alleged common-law slander: injunction of future (potential) defamatory utterances by the Defendants.

The Amended Complaint alleges another tort for which injunctive relief is sought, tortious interference with prospective business relations, which has withstood the Defendants' Motion to Dismiss.[1] The matter is before me on the remainder of that Motion, on which I withheld judgment, concerning the Plaintiff's request that I find common-law defamation, and enjoin future defamatory utterances, as described above.[2] This Opinion considers whether equity will entertain such a request to enjoin future defamatory speech.

*Equity will not enjoin a libel*. Maxims of equity are legendarily pithy expressions of general Chancery practice. Law (and particularly its more flexible component, equity) is a creature of nuance and fine-but-significant gradations, and pithiness, like garlic, may both enhance the savor of a discourse, and at the same time mask its subtle flavors. Maxims, in other words, are often best defined by their

---

[1] Also surviving the Motion to Dismiss was a count brought under New York's Donnelly Act. I dismissed a count for tortious interference with contract.

[2] This is an expedited matter. I informed the parties from the bench that I would dismiss this defamation count, so that they would not needlessly prepare to litigate this matter while a written decision was being prepared. Trial was held on July 29 and 30, 2019 on the Donnelly Act and tortious interference with prospective business relations claims, and is pending post-trial briefing.

exceptions. It is true, nonetheless, that generally, equity will not enjoin future speech on the ground that such speech, if uttered, may be defamatory.

The Court of Chancery is a court of limited jurisdiction; when addressing a common-law tort, this Court may act only if equity is required in remedy, due to an insufficiency of remedies at law.[3] Moreover, because of the implications on speech of the application of remedies, legal or equitable, to tortious speech, slander and libel are seen as denizens of the Superior Court, and are subject to the findings made there by juries regarding the speech of their peers. Thus, Chancery is said to have no jurisdiction over libel. This principle was recently affirmed by Vice Chancellor Slights, who dismissed a defamation case (subject to transfer to Superior Court) on that ground.[4]

A single case in this jurisdiction supports a so-called trade-libel exception to the rule that Chancery will not exercise jurisdiction over a request to enjoin a libel: *J.C. Pitman & Sons, Inc. v. Pitman*.[5] *Pitman* has recently been subject to scholarly consideration by Vice Chancellor Laster;[6] nonetheless, I confess I find the *Pitman* decision somewhat opaque. I conclude, however, that *Pitman* stands for the

---

[3] Chancery jurisdiction must rest on one of three grounds: equitable action (*i.e.*, fiduciary relationships), equitable remedy, or statutory jurisdiction. *See Candlewood Timber Grp. v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004). Once vested with jurisdiction, Chancery may "clean up" associated legal matters.

[4] *Perlman v. Vox Media, Inc.*, 2019 WL 2647520 (Del. Ch. June 27, 2019).

[5] 47 A.2d 721 (Del. Ch. 1946).

[6] *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102 (Del. Ch. 2017).

following proposition: The general rule is that equity lacks jurisdiction over a request to enjoin common-law defamation.  In a limited subset of cases, however, a separate tort (in *Pitman*, the tort of unfair business competition) is alleged where relief at law is insufficient, and where the equitable remedy sought is, incidentally, an injunction of a "trade libel"—that is, a libelous statement to consumers that falsely disparages a plaintiff's goods or services.  In such a case, the matter is within this Court's jurisdiction, because the underlying behavior being examined without a jury is not mere speech, but involves other tortious activity where tradition and constitutional considerations do not require the findings of a jury.  Further, this Court may enjoin that tortious behavior, even if the injunction incidentally enjoins the trade libel.  In other words, under *Pitman*, where this Court has jurisdiction over business torts, it may, in an appropriate case, enjoin their threatened continuation, even if the injunction suppresses speech.  In this case, for instance, the Plaintiff has adequately pled tortious interference with business relations; if it proves that claim, it may seek equitable remedies, as appropriate.

Contrary to the Plaintiff's argument, addressed below, I do not read *Pitman* to support a *separate* count of common-law slander, as the Plaintiff contends, nor does *Pitman* support the kind of forward-looking suppression of new defamatory statements of the variety sought here.

The Plaintiff's broad request to enjoin future speech raises substantial state and federal constitutional questions. However, I need not reach these questions, as I find I am without jurisdiction on the basis that *equity will not enjoin a libel*.

I explain my reasoning further, below.

## I. BACKGROUND

At this Motion to Dismiss stage, I assume as true the facts pled in the Amended Complaint.[7]

*A. The Parties*

Plaintiff Preston Hollow Capital LLC ("Preston Hollow") is a Delaware limited liability company.[8] Preston Hollow invests in high-yield municipal bonds.[9] It was formed in 2014 and currently has approximately $1.8 billion in assets and $1.3 billion in equity capital.[10]

Defendant Nuveen LLC is a Delaware limited liability company.[11]

Defendant Nuveen Investments, Inc. is a Delaware corporation.[12]

Defendant Nuveen Securities LLC is a Delaware limited liability company.[13]

---

[7] As described below, this expedited matter has now been tried and is awaiting post-trial briefing on Preston Hollow's two remaining non-defamation counts, including briefing on numerous evidentiary objections. Notwithstanding the record created at trial, I rely only on the well-pled facts in the Amended Complaint for this Opinion regarding the Motion to Dismiss.
[8] Am. Compl. ¶ 7.
[9] *Id.* ¶ 1.
[10] *Id.* ¶ 17.
[11] *Id.* ¶ 8.
[12] *Id.* ¶ 9.
[13] *Id.* ¶ 10.

Defendant Nuveen Asset Management LLC is a Delaware limited liability company.[14] I refer to the Defendants, collectively, as "Nuveen." Nuveen is "one of the world's largest institutional investors in municipal bonds, with municipal fixed income assets under management of more than $150 billion."[15]

*B. Factual Background*

1. The Parties' Roles in the Municipal Bond Market

Municipal bonds are debt securities issued by cities, counties, states, and other governmental or non-profit entities to fund day-to-day obligations, as well as to finance specific projects, such as schools, bridges, and other public works.[16] "The municipal bond market is comprised of over one million distinct municipal securities, issued by more than 50,000 different issuers, with approximately $3.9 trillion in outstanding securities."[17] Municipal bonds generally pay interest that is exempt from federal income tax, and which may be exempted from state taxes as well.[18] Investment bankers often act as broker-dealers in the municipal bond market, working as intermediaries between issuers and prospective investors.[19]

Preston Hollow and Nuveen are both investors; investors often have financing relationships with banks and broker-dealers, which allow them to effectively finance

---

[14] *Id.* ¶ 11.
[15] *Id.* ¶ 1.
[16] *Id.* ¶ 13.
[17] *Id.*
[18] *Id.*
[19] *Id.* ¶ 14.

the purchase of bonds at tax-exempt rates.[20] These arrangements likewise present attractive revenue opportunities for banks and broker-dealers.[21] Municipal bonds are issued through both public and private offerings.[22]

Preston Hollow describes itself as a unique player in the municipal bond market. Per the Amended Complaint, it "frequently invests in high yield municipal securities in underwritten limited public offerings in which [it] typically purchases 100% of the offered securities through negotiated agreements with the issuers, borrowers, underwriters, and (where applicable) financial advisors."[23] Because it is "a permanent capital vehicle, not a fund that must provide liquidity to its investors, it is a stable, secure funding source with certainty of execution."[24] Preston Hollow's investments are "bespoke, highly negotiated transactions."[25] Therefore, Preston Hollow's business model is "highly dependent upon its relationship with broker-dealers, since the investment bankers are able to identify which of their issuer clients and transactions will benefit from Preston Hollow's unique positioning and sector expertise."[26] "If broker-dealers do not make Preston Hollow aware of investment opportunities, or if they refuse to serve as underwriter for transactions that Preston

---

[20] *Id.* ¶ 15.
[21] *Id.*
[22] *Id.* ¶ 16.
[23] *Id.* ¶ 18.
[24] *Id.*
[25] *Id.* ¶ 20.
[26] *Id.* ¶ 23.

Hollow directly originates, Preston Hollow's business of investing in municipal bonds that are the product of its custom-structured solutions will be significantly impaired."[27] Similarly, Preston Hollow alleges that its business will be damaged if lenders and broker-dealers will not provide financing for Preston Hollow investments.[28]

### 2. Nuveen's Alleged Misconduct

Preston Hollow alleges that it recently closed two municipal bond investments; "because these investments were made available by broker-dealers through limited public offerings that were negotiated and structured by Preston Hollow as 100% placements, Nuveen was unable to participate in the purchase of the municipal bonds."[29] As Nuveen missed out on that opportunity, John V. Miller, Nuveen's head of municipal finance, and his staff have purportedly initiated phone calls and meetings with representatives of "substantially all of the leading broker-dealers covering the municipal bond market."[30] In those calls, "Miller threatened to use Nuveen's considerable market power . . . to withhold business from any broker-dealer that engaged in limited public offerings with Preston Hollow and to retaliate

---

[27] *Id.* ¶ 26.
[28] *Id.* ¶ 27.
[29] *Id.* ¶ 31.
[30] *Id.* ¶ 37.

in other ways if the institutions refuse to cooperate with Nuveen in eliminating or limiting activity with Preston Hollow."[31]

Specifically, Preston Hollow contends that Miller called Deutsche Bank, Preston Hollow's primary lender, on December 20 and 21, 2018, demanding that Deutsche Bank unwind its current financing transactions with Preston Hollow and to not engage in business with Preston Hollow in the future.[32] If Deutsche Bank did not comply, Miller threatened that Nuveen would no longer do business with Deutsche Bank.[33] Miller also represented that other financial institutions had already agreed not to do one hundred percent placements with Preston Hollow.[34]

Preston Hollow also contends that in his call with Deutsche Bank, Miller made "demonstrably false and defamatory statements" about Preston Hollow.[35] Miller told Deutsche Bank that Preston Hollow "charged excessive rates for its investments, causing public issuers to overpay for public works projects backed by the bonds."[36] Miller also told Deutsche Bank that Preston Hollow's recent placement was a "rushed, corrupt deal."[37]

---

[31] *Id.*
[32] *Id.* ¶ 38.
[33] *Id.* ¶ 40.
[34] *Id.*
[35] *Id.* ¶ 41.
[36] *Id.*
[37] *Id.*

Per Preston Hollow, following Miller's phone call with Deutsche Bank, Nuveen moved more than $500 million of tender option bond financing from Deutsche Bank to Barclays.[38]

Subsequently, Miller and his team made calls to other financial institutions, all of which Preston Hollow "had a reasonable prospect of doing business with . . . in the future."[39] On February 25, 2019, one financial institution informed Preston Hollow that it would not engage in one hundred percent placements in the future, apparently as the result of Nuveen's "threats and its superior bargaining position."[40] On the same day, another financial institution informed Preston Hollow that in the future, it would limit certain kinds of issuances it engaged in with Preston Hollow, "based upon Nuveen's threats."[41]

On January 15, 2019, Preston Hollow sent a cease and desist letter to Nuveen, demanding that Nuveen stop all unlawful communication; that it undertake an internal investigation to identify what people and institutions Nuveen's employees contacted regarding Preston Hollow, and communicate the results to Preston Hollow; that it take steps to undo the harm already caused; and that it adopt supervisory procedures to prevent similar incidents in the future.[42] On February 22,

---

[38] *Id.* ¶ 42.
[39] *Id.* ¶ 43.
[40] *Id.* ¶ 45.
[41] *Id.* ¶ 46.
[42] *Id.* ¶ 49.

2019, Nuveen issued a letter to the legal department at each financial institution Preston Hollow had identified as having been contacted by Nuveen, disavowing any agreement between Nuveen and the financial institutions regarding Preston Hollow, and noting that Nuveen "reserves the right to conduct its trading business with firms within its lawful discretion and to hold and express its views and judgments in pursuing its investment advisory and trading activities."[43]

*C. Procedural Posture*

Unsatisfied with Nuveen's response to its cease and desist letter, Preston Hollow filed suit in this Court on February 28, 2019. The Complaint pled four counts: (1) tortious interference with contract; (2) tortious interference with prospective business relations; (3) violation of New York State's Donnelly Antitrust Act; and (4) defamation.[44] Preston Hollow sought solely injunctive relief, both preliminary and permanent—it does not seek damages. Along with its Complaint, Preston Hollow also filed a Motion for Preliminary Injunction and the requisite Motion to Expedite. Nuveen contested expedition; on March 14, I granted the Motion to Expedite and directed the parties to proceed to trial in July on the request for permanent injunctive relief; trial on Counts II and III was held on July 29 and 30, 2019.

---

[43] *Id.* ¶ 50.
[44] *See* Compl.

10

Preston Hollow filed an Amended Complaint on March 20, 2019, which pled the same four counts as the original Complaint. On April 3, 2019, Nuveen filed a Motion to Dismiss the Amended Complaint. Argument on the Motion to Dismiss was held on April 30, 2019. In light of the impending trial, I issued a partial bench decision on May 14, 2019. I granted the Motion to Dismiss as to Count I, tortious interference with contract, and denied it as to Counts II and III, tortious interference with prospective business relations and violation of the Donnelly Act, respectively.[45] I withheld decision on whether Count IV, defamation, should be dismissed, and I asked the parties to file supplemental submissions regarding whether final injunctive relief may issue to enjoin defamation. This Opinion, addressing that limited issue, follows.

Given the approaching trial date, I informed the parties from the bench that I intended to dismiss the defamation claim, and that I would later issue a written opinion. Since then, this matter has been tried. While the facts at trial differ to some extent, I consider for purposes of this Opinion only the facts as pled in the Amended Complaint.

---

[45] Preston Hollow seeks injunctive relief for these claims, vesting this Court with equitable jurisdiction.

## II. ANALYSIS

*A. Legal Standards*

### 1. Motion to Dismiss Standard

When faced with a motion to dismiss under Court of Chancery Rule 12(b)(6), failure to state a claim, "the court must assume the truthfulness of all well-pled allegations in the complaint and view those facts, and all reasonable inferences drawn from them, in a light most favorable to the plaintiff."[46]  The motion "will be granted where it appears with 'reasonable certainty' that the plaintiff could not prevail on any set of facts that can be inferred from the pleadings."[47]

Equitable jurisdiction is a predicate issue for every matter in this court of limited jurisdiction.[48]

### 2. Defamation Standard

"Defamation is generally understood as 'a false publication calculated to bring one into disrepute.'"[49]  Ordinarily, the elements of defamation are: (1) defamatory communication; (2) publication; (3) reference to the plaintiff; (4) third party's understanding of the communication's defamatory character; and (5) injury.[50]

---

[46] *Quereguan v. New Castle Cty.*, 2004 WL 2271606, at *1 (Del. Ch. Sept. 28, 2004).

[47] *Leonard Loventhal Account v. Hilton Hotels Corp.*, 2000 WL 1528909, at *3 (Del. Ch. Oct. 10, 2000) (quoting *Solomon v. Pathe Comm'ns Corp.*, 672 A.2d 35, 38 (Del. 1996)).

[48] *See Athene Life and Annuity Co. v. Am. Gen. Life Ins. Co.*, 2019 WL 3451376 (Del. Ch. July 31, 2019).

[49] *Naples v. New Castle Cty.*, 2015 WL 1478206, at *12 (Del. Super. Ct. Mar. 30, 2015) (quoting *Read v. Carpenter*, 1995 WL 945544, at *2 (Del. Super. Ct. June 8, 1995)), aff'd, 127 A.3d 399 (Del. 2015).

[50] *Id.*

"Under Delaware law there is no liability for defamation when a statement is determined to be substantially true."[51] While at this motion to dismiss stage, I must accept the Plaintiff's allegations as true, a plaintiff would bear the burden of proof for each of these elements at trial.[52]

At common law, defamation consists of the "twin torts" of libel and slander.[53] In *Spence v. Funk*, the Delaware Supreme Court noted that these so-called twins are fraternal, not identical:

> In shortest terms, libel is written defamation and slander is oral defamation. The two have vastly different historical bases and have been treated differently by the common law courts but, in general, the scope of liability is greater for libel, and the pleading requirements for libel are less strict. . . . [W]hile all slanderous statements would be libelous if written, not all libelous statements would be slanderous if spoken.[54]

Unlike libel, slander is generally not actionable unless the plaintiff provides proof of special damages.[55] There is good reason for this difference between slander and libel: the written word leaves a more permanent blot on one's reputation, the written word is capable of wider circulation, and reducing a defamation to writing requires greater deliberation and intention on the part of the one who records it.[56] However,

---

[51] *Riley v. Moyed*, 529 A.2d 248, 253 (Del. 1987) (citing *Gannett Co., Inc. v. Re*, 496 A.2d 553, 557 (Del. 1985)).
[52] *See Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005).
[53] *Spence v. Funk*, 396 A.2d 967, 970 (Del. 1978) (citing *Prosser on Torts* § 111 (1971)).
[54] *Id.*
[55] *Id.*
[56] *Rice v. Simmons*, 2 Harr. 417, 422 (Del. Ct. of Err. and Apps. 1836).

13

at common law, there have historically been four categories of slander, collectively called slander *per se*, that do not require proof of special damages.[57] One category of slander *per se*, relevant here, includes statements that malign one in a trade, business, or profession.[58]

The purportedly-defamatory statements at issue here were oral communications, which Nuveen allegedly made, in the form of phone calls to banks. Thus, if proven, the defamation would constitute slander—that is, oral defamation. Preston Hollow has not argued special damages, nor has it alleged slander *per se*, nor has it addressed the heightened standard for slander (as compared to libel) at all. Nevertheless, the communications here appear to meet the requirements for slander *per se*, because assuming (as I must) that they were uttered as alleged, they malign Preston Hollow in its business as an investor in municipal bonds. Therefore, for purposes of this Opinion, I assume that the slander *per se* requirements are satisfied, and that Preston Hollow need not allege special damages. As a result, I consider the Motion to Dismiss under the above five-factor standard for defamation. The Complaint alleges that Nuveen communicated false statements to Preston Hollow's potential business partners, in a manner that those parties understood were of a

---

[57] That is, damages shown to actually flow proximately from the wrong at issue.

[58] *Optical Air Data Sys., LLC v. L-3 Comm'ns Corp.*, 2019 WL 328429, at *7 (Del. Super. Ct. Jan. 23, 2019). The other three traditional categories comprising *per se* slander are (1) statements that impute a crime; (2) imply that one has a loathsome disease; or (3) impute unchastity to a woman. *Id.* It is not obvious that the usefulness of all of these categories persists.

defamatory character, to Preston Hollow's detriment. This states a claim for defamation; the sole issue remaining is whether this Court possesses jurisdiction over a defamation claim that seeks to enjoin future utterances.

*B. Equity Will Not Enjoin Defamation*

In considering the jurisdictional issue presented, it is important to note the precise relief Preston Hollow seeks here: an order "preventing [Nuveen] from engaging in *further* unlawful and tortious communications with lenders, broker-dealers and other participants in the high yield municipal bond market."[59] Thus, given the facts as stated above, the question before me is this: will equity enjoin future defamation? The answer is no.

1. The Traditional Maxim

Preston Hollow seeks forward-looking injunctive relief, to prevent Nuveen from making new defamatory statements in the future. In general, injunctions against future wrongdoing are not available; to be warranted, the plaintiff must establish a "reasonable apprehension of a future wrong."[60]

---

[59] Am. Compl., at 25 (emphasis added). Preston Hollow also seeks injunctive relief to require "Nuveen to take steps to rectify the harm already caused . . . by withdrawing and disavowing the tortious communications" and to require "Nuveen to adopt supervisory procedures to ensure . . . [its] representatives do not engage in similar []conduct in the future." *Id.*

[60] *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102, 114–15 (Del. Ch. 2017) (quoting *McMahon v. New Castle Assocs.*, 532 A.2d 601, 606 (Del. Ch. 1987)).

15

Moreover, a court's ability "to issue injunctive relief is even more constrained in a defamation case than in a garden-variety tort case or breach of contract case."[61] The principles underlying this constraint are laid out in scholarly fashion in Vice Chancellor Laster's opinion in *Organovo Holdings, Inc. v. Dimitrov*. As explained there, under traditional principles, equity declined to exercise jurisdiction over such cases, which gave rise to the maxim that "equity will not enjoin a libel."[62] The reasons given for this no-injunction rule vary and have shifted over time. The original intent behind the rule was to give jurors, rather than judges, the ability to determine whether statements were defamatory.[63] In other words, a defendant, if she is to be sanctioned *solely for her speech*, is entitled to have that speech reviewed by her peers. That rationale remains persuasive in Delaware, given the vitality here of the split between equity and law. This Court has jurisdiction over matters arising in, or to be remedied by, equity, as well as certain issues for which jurisdiction has been statutorily conferred by the legislature. Where equity has jurisdiction over legal claims because equitable relief is sought (or as vested by statute), it is the judge, not a jury, who makes factual findings.[64] As a result, factual determinations for

---

[61] *Id.* at 115.

[62] *Id.*

[63] *Id.* at 115–16; *see also id.* at 118 ("charges of slander are peculiarly adapted to and require trial by jury" (quoting *Kidd v. Horry*, 28 F. 773, 776 (Bradley, Circuit Justice, C.C.E.D. Pa. 1886))).

[64] I note that historically, a jury trial was available in the Court of Chancery; however, "[a] jury trial in Chancery is advisory only. An advisory jury verdict which may be disregarded by the Chancery judge is not entirely equivalent to a jury verdict at law." *Getty Ref. & Mktg. Co. v. Park Oil, Inc.*, 385 A.2d 147, 151 (Del. Ch. 1978), *aff'd*, *Park Oil, Inc. v. Getty Ref. & Mktg. Co.*, 407

16

which a defendant could traditionally insist on a jury at law are, in Chancery, reserved to the Court.  While a defendant in Chancery may request severance and transfer of legal issues to the Superior Court for purposes of determination of fact by a jury, such requests are subject to the discretion of the presiding judge.[65]  And where, as is typical, facts relevant to legal issues and equitable relief are intertwined, a request to sever and transfer is unlikely to be granted.[66]  It is against this background that the doctrine under which equity declines jurisdiction to enjoin libel—in light of speech concerns[67]—should be viewed.

The issue of whether a defendant may be sanctioned for speech alone must be determined in courts of law with access to juries for reasons of public policy.  This Court has previously stated that "Delaware law echoes the strong preference for jury

---

A.2d 533 (Del. 1979) (citing *Scotton v. Wright*, 122 A. 541 (Del. Ch. 1923)).  Such an advisory jury would not, in my view, fulfill the public policy purpose of Article I, Section 5 of the Delaware Constitution, which suggests that defamation torts should be tried to a jury.  Moreover, as discussed in *Getty Refining*, "[t]he old procedure of framing issues by the Court of Chancery for jury trial is now probably outmoded and this Court is certainly not equipped to hold jury trials itself even if permissible.  A far better solution . . . [is] transfer to the Superior Court . . . ." *Id.*  In other words, to the extent a jury in the Court of Chancery is not extinct, it is a vestigal structure, more evocative of the human appendix or coccyx than that vital organ, the Superior Court petit jury.

[65] *See Organovo Hldgs.*, 162 A.3d at 115–116.

[66] *See id.*

[67] *See Spence v. Funk*, 396 A.2d 967, 969 (Del. 1978) ("The law of defamation is a reflection of society's attempt to accommodate two important but often conflicting policies: on one hand, the policy of protecting a person in the enjoyment of his good name and reputation and, on the other, the policy of encouraging freedom of expression.").

17

determinations of defamation claims."[68]  Under Article I, Section 5 of the Delaware

Constitution of 1897,

> The free communication of thoughts and opinions is one of the invaluable rights of man.  The press shall be free to every citizen who undertakes to examine the official conduct of persons acting in a public capacity; and any citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.  In prosecutions for publications, investigating the proceedings of officers, or where the matter published is proper for public information, the truth thereof may be given in evidence; *and in all indictments for libels the jury may determine the facts and the law*, as in other cases.[69]

Today, the American legal system places particular emphasis on principles of

free speech, and the court systems (with Delaware as an exception) combine law and

equity; thus, "a majority of the jurisdictions that refuse to enjoin future defamatory

speech [now] rely primarily on constitutional" provisions that relate to freedom of

speech.[70]  Regardless of the rationale, "the general rule continues to be that a court

of equity will not issue an injunction against future defamatory speech."[71]  Actions

for defamation belong in the law courts, not Chancery.

---

[68] *Organovo Hldgs.*, 162 A.3d at 124.

[69] Del. Const. of 1897 art. I, § 5 (emphasis added).

[70] *Organovo Hldgs.*, 162 A.3d at 119; *see also, generally, CapStack Nashville 3 LLC v. MACC Venture Partners*, 2018 WL 3949274 (Del. Ch. Aug. 16, 2018).  Freedom of speech is protected under the First Amendment of the United States Constitution.  The first two sentences of Article I, Section 5 of the Delaware Constitution of 1897 enshrine the same principles, and has been defined by our Supreme Court as coterminous with the rights provided by the First Amendment. *Gannett Co., Inc. v. State*, 571 A.2d 735, 740 n.9 (Del. 1989) ("We have previously noted that [Article I, Section 5] has the same scope as the federal first amendment." (citing *In re Opinion of the Justices*, 324 A.2d 211, 213 (Del. 1974))).

[71] *Organovo Hldgs.*, 162 A.3d at 119.  For a more thorough historical account of the no-injunction rule, I direct the interested reader to Vice Chancellor Laster's scholarly treatment in *Organovo*.

18

This Court recently had the opportunity to consider whether Chancery has jurisdiction to hear defamation claims, and determined that it does not. In *Perlman v. Vox Media, Inc.*, the plaintiff alleged defamation and sought damages and mandatory injunctive relief, to require the defendant to remove allegedly-defamatory statements from its website.[72] Discussing *Organovo*, Vice Chancellor Slights reasoned that juries must determine whether defamation has occurred, and concluded that the matter should be transferred to the Superior Court.[73]

Thus, unless an exception to this traditional restraint on equity applies,[74] Preston Hollow's defamation claim must be dismissed, or transferred to a court of law.

---

[72] 2019 WL 2647520, at *4.

[73] *Id.* at *5–6.

[74] Preston Hollow avers that "Delaware Courts have . . . enjoined defamatory speech . . . ." *See* Pl.'s Supp. Br. on the Availability of Perm. Inj. Relief for Business-Related Defamation, at 13. The cases it cites are, I find, inapposite. It cites *Liberty Life Assurance Society v. Heralds of Liberty*, 138 A. 634 (Del. Ch. 1927), but that matter involved a preliminary injunction of use of a trade name, not common-law defamation. It cites *Agilent Tech., Inc. v. Kirland*, 2009 WL 119865 (Del. Ch. January 20, 2009), but that case only discusses (and does not impose) injunctive relief pursuant to a statute, the Delaware Deceptive Trade Practices Act. The remaining citations are to *Triton Construction Company, Inc. v. Eastern Shore Electrical Services, Inc.*, 2009 WL 1387115 (Del. Ch. May 18, 2009) and *Aquino v. Dakota*, 2007 WL 3234914 (Del. Ch. Jan. 31, 2007), in which the Court entered injunction orders *by stipulation or consent*. For obvious reasons, those cases are of no import here.

19

## 2. The Trade Libel Exception

Over time, an exception arose to the traditional rule that equity will not enjoin defamation, which applied in instances of "trade libel."[75]  A brief examination of the history behind the exception is illustrative.

At first, nineteenth-century English courts began granting injunctions to "restrain injurious publications concerning property which operate as a slander of the owner's title, and libelous publications which are injurious to the plaintiff's business, trade, or profession, and the wrongful use of a name by which the public would be misled, and the plaintiff injured in his business."[76]  This shift, following England's merger of law and equity, was "the result of the new system by which the one court is empowered to administer both legal and equitable remedies in any and all actions."[77]  American courts continued to adhere to the traditional no-injunction rule.[78]

During the twentieth century, however, American juridsictions, primarily with merged courts of equity and law, themselves began to recognize the so-called "trade-libel exception" to the no-injunction rule.  "American courts increasingly granted

---

[75] A second potential exception, a suit in equity to enjoin replication of a statement already adjudged to be defamatory at law, commonly termed the "adjudicated falsehoods" exception, is factually inapplicable here.

[76] *Pomeroy on Equity Jurisprudence* § 1358 (2d ed. 1892) (emphasis added).

[77] *Id.*

[78] *Id.* ("The American courts seem, thus far, unwilling to follow the example of the recent English decisions, and they decline to extend the jurisdiction so as to restrain such torts as libels on business, slanders of title, and the like.").

preliminary injunctions to address trade libel, a concept that initially covered statements disparaging the quality of property, then expanded to encompass any injury to economic advantage arising from false derogatory statements."[79]

A sole case from this jurisdiction, *J.C. Pitman & Sons, Inc. v. Pitman*,[80] adopts a version of the trade-libel exception. In that case, both Pitman Manufacturing Company and J.C. Pitman & Sons, Inc. sold deep fat frying equipment in the United States.[81] The communications at issue were a series of letters to customers published by J.C. Pitman & Sons, written after customers had purportedly indicated that they were confused whether J.C. Pitman & Sons was associated with Pitman Manufacturing Company. One letter assured customers that there was no association between the two companies; a second letter accused Pitman Manufacturing of engaging in a "campaign to confuse and deceive the trade," and proceeded to warn customers that if they bought Pitman Manufacturing's fryer, they could, among other things, "unwittingly become involved" in litigation between Pitman Manufacturing and J.C. Pitman.[82] J.C. Pitman filed suit against Pitman Manufacturing, and Pitman Manufacturing filed a counterclaim, seeking an order to enjoin J.C. Pitman from continuing to publish the defamatory letters.[83]

---

[79] *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102, 120 (Del. Ch. 2017) (quotations omitted).
[80] 47 A.2d 721 (Del. Ch. 1946).
[81] *Id.* at 722. The equipment sold includes what must surely be one of the best trade names ever devised, the "Frialator."
[82] *Id.* at 722–24.
[83] *Id.* at 724.

21

The *Pitman* decision discusses exceptions to the no-injunction rule. It notes that in England, "prior to [the merger of law and equity in] 1873, if there were some other ground for equitable relief, the fact that the publication was also libelous would not prevent the issuance of an injunction."[84] It further states that American courts will not enjoin "mere trade libels," but that when "a court of equity has jurisdiction on some other ground, the American courts will also usually enjoin the *continued publication* of a trade libel *incident thereto*."[85]

In *Pitman*, this Court denied a demurrer—that is, it declined to dismiss the claim for injunctive relief—of Pitman Manufacturing's request to enjoin J.C. Pitman from continuing to publish the defamatory letters.[86] It reasoned that the statements adequately allege that J.C. Pitman "sought to intimidate customers and prospective customers of the complainant by baseless threats to involve them in litigation if they dealt with [Pitman Manufacturing]."[87] The Court noted J.C. Pitman's allegation "that these statements were merely of an advisory and friendly nature," but reasoned that "they would hardly be so construed by persons receiving the letters."[88] That is,

---

[84] *Id.* at 725 (citation omitted).

[85] *Id.* (emphasis added). The *Pitman* court does not directly explain why the exception is limited to business torts and trade libel; presumably, unlike defendants in standard defamation actions, businesses may see an economic rationale to absorbing damages and continuing to defame a competitor. This malincentive evinces a need for injunction of what *Pitman* describes as "continuing publication" of libel "incident to" the non-speech tort.

[86] *Id.* at 726.

[87] *Id.*

[88] *Id.*

the letters were not merely libelous; they also supported an independent tort, unfair competition.[89] The injunctive remedy sought, presumably, was "incident to" the tort of unfair competition, and did not require the court to enjoin mere speech. Accordingly, the Court declined to dismiss the matter on the ground that it had no jurisdiction to hear the matter in equity.[90]

More recently, this Court again faced a request for injunctive relief to prevent defamation, in *Organovo Holdings, Inc. v. Dimitrov*.[91] In *Organovo*, the Court assumed for the purposes of its analysis that in Delaware, in a case consistent with the *Pitman* analysis, equity may entertain a request to enjoin speech; it also assumed for the purposes of its analysis that the complaint pled a trade libel.[92] Nevertheless, such injunctive relief, under *Pitman*, requires that the plaintiff assert a separate business tort that is furthered by the speech, thereby invoking the application of equity to a wrong other than "mere" defamation.[93] Because in *Organovo* the plaintiff's claim for tortious interference with prospective economic advantage—a separate tort—was dismissed at the pleading stage, all that remained was an

---

[89] *See id.* at 722.
[90] *Id.*
[91] *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102 (Del. Ch. 2017).
[92] *Id.* at 122 ("Viewing the Complaint charitably, the Company might be seen as having attempted to plead a trade libel.").
[93] *Id.* at 123.

allegation of trade libel.[94]   Accordingly, the defamation claim was also dismissed, for lack of jurisdiction.[95]

To summarize, at common law, equity had no jurisdiction to hear defamation claims; such matters were reserved for determination by a jury at law.  Over time, courts began to recognize a "trade-libel" exception to the traditional rule that equity will not enjoin a libel.  The sole Delaware case recognizing the legitimacy of such an exception is *Pitman*.  There, this Court denied a demurrer, on the ground that under the trade-libel exception, it had jurisdiction to consider an injunction of allegedly-defamatory speech necessitated by the threatened continuance of a separate non-speech tort, unfair competition.[96]

---

[94] *Id.*

[95] *Id.*

[96] This tort, "unfair competition," has been partly subsumed under the Delaware Unfair Trade Practices Act, its federal cousin, the Lanham Act, and similar statutes in other states.  *See* 6 Del. C. §§ 2531, *et seq*; 15 U.S.C. § 1051, *et seq*.  As *Organovo* notes in dicta, the "legitimacy of this type of injunction"—that is, the type of injunction that would issue to enjoin a trade libel as necessary to remedy the common-law tort of unfair competition—"largely became moot after the passage of statutes like the Lanham Act and state laws against deceptive trade practices, which specifically authorized injunctive relief."  *Organovo Hldgs.*, 162 A.3d at 120 (citations omitted). To the extent that unfair competition exists as an independent common-law tort, it is essentially the same tort that has survived a Motion to Dismiss in the instant case, tortious interference with prospective business relations. *Compare Rypac Packaging Mach. Inc. v. Coakley*, 2000 WL 567895, at *8 (Del. Ch. May 1, 2000) ("The elements of the tort of unfair competition are that the plaintiff has a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm.") *with Beard Res., Inc. v. Kates*, 8 A.3d 573, 607–08 (Del. Ch. 2010) ("To prove a claim for tortious interference with prospective business relations, a plaintiff must show: (1) a reasonable probability of a business opportunity; (2) intentional interference by a defendant with that opportunity; (3) proximate causation; and (4) damages.").

24

Preston Hollow contends that, because it has pled a non-speech business tort here—essentially the same tort pled in *Pitman*—it may maintain a *separate* cause of action for the alleged slander.[97]  If Preston Hollow were correct, it would mean that, even if I found at trial that Preston Hollow had not satisfied its burden of proof regarding tortious interference with prospective business relations, I could still find that Nuveen had committed slander, and, based solely on that finding, I could enjoin Nuveen's future speech if I found its past speech had been defamatory.  A suit for such an injunction remedy for mere slander, decided without a jury, is precisely the action dismissed in *Perlman*.  This reads *Pitman* far too broadly; it would stand the rule against enjoining libel on its head and expand the *Pitman* doctrine beyond reason.  It is also incompatible with the ruling in *Organovo.*  To the extent *Pitman* is applicable here, it provides that I need not dismiss the *non-speech business tort itself* merely because the remedy sought may include injunction of allegedly-defamatory speech.[98]  It does not, however, provide that I may entertain a cause of action to enjoin mere slander.  To the extent *Pitman* may be read in that way—which I find dubious—I decline to follow it here.

---

[97] Pl.'s Supp. Br. on the Availability of Perm. Inj. Relief for Business-Related Defamation, at 7–11.

[98] The Defendants did not seek to dismiss the non-speech business tort, tortious interference with prospective business relations, on such grounds.  Nothing in this Opinion should be read to limit the available remedy, if Preston Hollow demonstrates tortious interference with prospective business relations at trial; conversely, nothing in this Opinion should be read to preclude Nuveen from arguing that speech protections should limit the remedy to be applied.

*C. Preston Hollow's Defamation Claim Must Be Dismissed or Transferred*

As discussed at length above, this Court is without jurisdiction to determine whether slander has occurred here. In such a case, a plaintiff may generally transfer the matter to a court of law. I note that, unlike in *Perlman*, where the plaintiff sought damages (and relatively narrow injunctive relief to require the defendant to remove defamatory statements from its website), the remedy Preston Hollow seeks here is to enjoin any and all new defamatory statements made against Preston Hollow by Nuveen.[99] Preston Hollow does not seek damages. The relief it does seek is unavailable at law. Nonetheless, should Preston Hollow elect to transfer, and if the case proceeds at law, damages may be available. In the alternative, Preson Hollow may pursue solely its tortious interference claim (and its statutory claim), and, if successful, seek equitable relief here. Accordingly, I find that the defamation claim must be dismissed or transferred, at Preston Hollow's discretion.[100]

Under this Court's precedent, in general, equity will not enjoin future defamation, and I have determined that no exception to the general rule applies here.

---

[99] Because I am without jurisdiction to consider the alleged slander, I need not address the additional United States and Delaware constitutional concerns that would accompany consideration of the broad injunction sought here. For instance, the Delaware Constitution of 1897 protects free speech: "any citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty." Del. Const. of 1897 art. I, § 5.

[100] 10 *Del. C.* § 1902 ("No civil action, suit or other proceeding brought in any court of this State shall be dismissed solely on the ground that such court is without jurisdiction of the subject matter . . . . Such proceeding may be transferred to an appropriate court for hearing and determination.").

Accordingly, Preston Hollow's defamation claim must be dismissed, subject to election to transfer to Superior Court.

## III. CONCLUSION

For the foregoing reasons, the Motion to Dismiss Count IV, defamation, is granted, subject to transfer to Superior Court. An appropriate Order will issue separately.